**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


GIANINE BRACCIODIETA-NELSON,   )
  )
         Plaintiff   )
  )
         v.   )       02: 10-cv-854
  )
COMMISSIONER OF   )
SOCIAL SECURITY,   )
  )
         Defendant   )


**MEMORANDUM OPINION AND ORDER OF COURT**

April 27, 2011

## I.    INTRODUCTION

Plaintiff, Gianine Bracciodieta-Nelson ("Plaintiff"), brings this action pursuant to 42

U.S.C. § 405(g) for judicial review of the final determination of the Commissioner of Social

Security ("Defendant" or "Commissioner") which denied her application for disability insurance

benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act").


## II.    PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on January 23, 2007, claiming an inability to work

beginning on August 18, 2006, due to recurrent panic attacks with tremors, loss of breath, loss of

control of bodily functions, fear, and chest pain. (R. at 103)[1].   The claim was initially denied on

June 8, 2007, and Plaintiff filed a timely written request for a hearing. (R. at 59 – 63).   An

administrative hearing was held on March 18, 2008, before Administrative Law Judge Patricia C.

Henry ("ALJ").   Plaintiff was represented by counsel and testified at the hearing. (R. at 22).   Also

---

[1]      Citations to Document Nos. 6 – 6-8, the Record, *hereinafter*, "R. at __."

testifying at the hearing was Joseph J. Bentivegna, an impartial vocational expert ("VE"). (R. at 22).

On July 17, 2008, the ALJ rendered a decision that was unfavorable to Plaintiff. The ALJ determined that Plaintiff's costochondritis, atypical chest pain, depressive disorder, anxiety disorder, and panic disorder were "severe" impairments, but that these impairments, singly or in combination, did not meet or medically equal any of the criteria in Listings 1.00, 4.00, or 12.00 or any other listed impairments listed in 20 CFR Part 400, Subpart P, Appendix 1. The ALJ's decision became final on April 23, 2010, when the Appeals Council denied Plaintiff's request to review.

On June 25, 2010, Plaintiff filed her Complaint in this Court in which she seeks judicial review of the decision of the ALJ. The parties have filed cross-motions for summary judgment. Plaintiff argues that the ALJ improperly rejected evidence of her mental impairments and limitations[2] and also failed to properly assess her credibility. The Commissioner contends that the decision of the ALJ should be affirmed as it is supported by substantial evidence.

After a careful review of the entire record, the Court agrees with the Commissioner and will therefore grant the motion for summary judgment filed by the Commissioner and deny the motion for summary judgment filed by Plaintiff.

---

[2] The Court's examination of the record will be limited to Plaintiff's psychological impairments and limitations, in light of Plaintiff's lack of objection to the ALJ's determination regarding her physical impairments and limitations. (Document Nos. 13, 15).

### III. STATEMENT OF THE CASE

A.  <u>General Background</u>

Plaintiff was born June 13, 1977, and was thirty years of age at the time of her administrative hearing, which is defined as a "younger individual." (R. at 26, 103).  Plaintiff completed the tenth grade, but did not subsequently pursue a high school diploma or equivalent degree. (R. at 26).  Plaintiff has past relevant work experience as a waitress (2000 – 2001) and a phlebotomist with the Central Pennsylvania Blood Bank, Harrisburg, PA (2001 – 2006).  The VE testified that both these jobs are performed at the light exertional level and are semiskilled in nature.

Plaintiff has not been employed since August 17, 2006, at which time she went on a medical leave of absence from her employment. (R. at 26).  At the time of the hearing, Plaintiff was separated from her husband.  Prior to their separation, Plaintiff resided in Harrisburg, PA.  However, in December 26, 2006, Plaintiff moved to Indiana, PA to be closer to her father and sister.  At the time of the administrative hearing, Plaintiff lived in an apartment with her sister. (R. at 27).

B.  <u>Psychiatric Treatment History</u>

The record reflects that Plaintiff was seen for general medical needs at Pinnacle Health Family Medicine Center, Harrisburg, PA, from approximately April of 2005 until September of 2006. (R. at 236 – 47).  Plaintiff was diagnosed with anxiety and depression and found to suffer from panic attacks. (R. at 236 – 47).  The medical records from Pinnacle Health indicate that Plaintiff complained of frequent episodes of crying, fear of thinking about committing suicide, and distress over problems at work and with her husband. (R. at 236 – 47).  The medical records from

Pinnacle Health also reflect that Plaintiff was typically alert and oriented and in no acute distress. (R. at 236 – 47).

On July 5, 2005, Plaintiff sought treatment at Hershey Medical Center for left sided chest pain. (R. at 187). No abnormalities were found at the time, and Plaintiff was instructed to follow up with her primary care physician. (R. at 188). She was also given the contact information for a psychiatric outpatient clinic for unspecified reasons. (R. at 188). On July 7, 2005, Plaintiff followed up with her primary treating physician, John F. Barnoski, M.D., who opined that her chest pain may be attributable to her mental health condition.

Plaintiff returned to Hershey Medical Center on January 2, 2006, again complaining of chest pain. (R. at 179). A cardiac work-up yielded negative results. (R. at 180). Plaintiff was diagnosed with pleurisy. (R. at 180). While at the hospital, a physical examination revealed no gross neurological deficits, and no weight change, weakness, fatigue, shortness of breath, wheezing, sore throat, ear pain, rhinorrhea, abdominal pain, hematuria, dysuria, leg or calf pain, numbness or tingling in the extremities, and no suicidal behavior. (R. at 179). A history of panic attacks was noted. (R. at 179). Plaintiff returned to Hershey Medical Center on January 20, 2006, with complaints of dizziness. An examination revealed a normal sensory exam with no neurological deficits. (R. at 175).

Office notes of Dr. Barnoski reflect that Plaintiff was seen on April 3, 2006, for a variety of complaints, mainly with chest discomfort. Dr. Barnoski noted improvement in Plaintiff's anxiety and mood. (R. at 241).

On August 3, 2006, Plaintiff went to Lancaster General Hospital suffering from severe anxiety and panic attack with accompanying chest pains. (R. at 264). Plaintiff's history of panic attacks, and recent initiation of drug therapy for her depression was noted. (R. at 264). Upon

examination, no motor or sensory deficits were found. (R. at 265). Plaintiff exhibited normal

affect, and was both alert and oriented. (R. at 265). Plaintiff was diagnosed with palpitations and

an anxiety reaction – a suspected anxiety attack. (R. at 265).

The following day, Plaintiff was seen by Lancaster General Psychiatric Associates. (R. at

212). Upon examination by psychiatrist Hector Diaz, M.D., Plaintiff was given a global

assessment of functioning[3] ("GAF") score of 40. (R. at 212). Dr. Diaz noted that Plaintiff's

primary complaint was anxiety. (R. at 209). Though she was feeling relatively calm during her

evaluation by Dr. Diaz, Plaintiff complained that over the past two years her anxiety and panic had

been increasing in frequency. (R. at 209). Plaintiff further complained of difficulty with sleeping,

a lack of interest in hobbies, friends, and family, a feeling of restlessness, an inability to focus, and

consistent dysphoria. (R. at 209). Her depression also allegedly had been increasing and was

exacerbated by her anxiety. (R. at 209). Plaintiff stated that in the past, she had been the victim of

physical and emotional trauma at the hands of a violent, drug-addicted brother, and she had once

been drugged and raped as a young adult. (R. at 209). She attempted suicide through trying to

overdose on pills when she was around thirteen years of age. (R. at 340).

Following a mental status examination, Dr. Diaz noted that Plaintiff was dressed casually

and appropriately, she spoke spontaneously, she joked appropriately, and she became tearful when

---

[3]      The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and
occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score
considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."
*American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed.
2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social,
occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment
in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome
impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family
relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or
hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to
function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain
minimal personal hygiene ... or gross impairment in communication...." *Id.*

recounting her past. (R. at 210). Plaintiff showed no symptoms of psychomotor retardation, thought disorder, hallucinations, delusions, or homicidal ideation. (R. at 210). She was restless and exhibited rare, passive suicidal ideation; however, her cognition was intact. (R. at 210).

On August 10, 2006, Plaintiff saw Dr. Barnoski "to discuss her emotions." Plaintiff told Dr. Barnoski that she had a severe episode of panic and went to the hospital where a psychiatrist told her that she was bipolar. Plaintiff told Dr. Barnoski that she did not feel that she could return to work as she had fear of panic when called on to do important things at work. Dr. Barnoski advised Plaintiff to get her disability papers to him and he would "put her off work as of 8-10." On August 17, 2006, Dr. Barnoski completed a short-term disability form for Plaintiff.

At a follow-up appointment with Dr. Diaz on August 29, 2006, Plaintiff was diagnosed with bipolar disorder. (R. at 207). Dr. Diaz noted that Plaintiff was calm, well kempt, cooperative, and exhibited normal speech form and content. (R. at 207). Plaintiff's mood was neutral, her affect was expansive, her "fund of knowledge" was "ok," her thoughts were organized and goal-directed, and she did not pose a threat to herself or others. (R. at 207).

On September 9, 2006, Plaintiff sought emergency treatment at Holy Spirit Health System's emergency room due to complaints of depression and suicidal thoughts. (R. at 222). Plaintiff was admitted involuntarily to Philhaven Hospital, Mt. Gretna, PA, where she received treatment in the hospital for approximately four days. Upon admission, Plaintiff was found to be alert and oriented, cooperative, and pleasant. (R. at 227). Plaintiff's mood was bright, although she was anxious. (R. at 227). Plaintiff was not delusional or homicidal and her mood was not overtly depressed. (*Id*.). Plaintiff was diagnosed with major depression, generalized anxiety disorder, and panic disorder. (*Id*.). Her GAF score was 25. (R. at 228).

On September 13, 2006, Plaintiff was discharged from inpatient treatment at Philhaven and moved to the Acute Partial Program, where she would remain under the care of psychiatrist Jeremy Walters, M.D. (R. at 228 – 30). Her GAF score at discharge was 61. (R. at 228). Upon discharge, it was noted that Plaintiff was alert and oriented, her thought processes were goal directed, her insight and judgment were good, her anxiety was low, and she denied any side effects related to her prescription medications. (R. at 230). Plaintiff claimed that she would likely continue to feel better once she returned home. (R. at 230).

The following day, September 14, 2006, Plaintiff entered the Philhaven Acute Partial Program. At Plaintiff's initial evaluation for the partial hospitalization program, Dr. Walters reduced her GAF score from 61, which he had assessed the day earlier, to a score of 45. (R. at 234). Plaintiff was diagnosed as suffering from major depression only. (R. at 234).

Two days later, Plaintiff was discharged from the partial hospitalization program and moved to the intensive outpatient program. The records from Philhaven indicate that Plaintiff had been a very active participant in therapy over the course of the two days that she was admitted to the program. (R. at 231). Plaintiff participated in the outpatient program approximately one month.

At her admission to the intensive outpatient program, Plaintiff was again assessed a GAF score of 45 and was diagnosed as suffering from major depressive disorder only. (R. at 281). Plaintiff was eventually discharged from this program on November 6, 2006. (R. at 278). Plaintiff participated in therapeutic groups, individual therapy, medication management, and joint sessions with others. (R. at 278). Plaintiff's attendance was only sporadic, though, and she spent only sixteen days in the program. (R. at 278). On a scale of ten, Plaintiff rated her depression as a five,

and her anxiety as a seven at the time of her discharge. (R. at 278). She denied suicidal and homicidal ideation. (R. at 278).

On September 21, 2006, Plaintiff returned to Dr. Barnoski for a follow-up. Plaintiff informed Dr. Barnoski that she had been admitted to Philhaven where she was told that she was not bipolar. Dr. Barnoski prepared a work slip for Plaintiff's employer which indicated that he anticipated that she would be returning to work on Monday, November 6, 2006. (R. at 237).

On October 18, 2006, Plaintiff was seen in the emergency room of Ephrata Community Hospital for complaints of left-sided chest pain. (R. at 198). Scans of Plaintiff's chest returned normal results. (R. at 199). Following an examination, it was noted that Plaintiff suffered from depression and anxiety, and she appeared to be in moderate distress. (R. at 198). However, Plaintiff was neurologically intact, she was alert and oriented, her memory was intact, her mood and affect were within normal limits, and she expressed neither depressed nor suicidal symptomology. (R. at 198).

On November 29, 2006, Plaintiff was seen by Jeremy Walters, M.D., Staff Psychiatrist at Philhaven, pursuant to her continuation of her general mental health treatment at Philhaven. (R. at 333.) She reported that her mood had improved since she was discharged from the intensive outpatient program at Philhaven. (*Id*.). She indicated that she did have "down" days and that she spent most of her time at home because she feared having a panic attack in public. (*Id*.). She reported, however, that her panic attacks were very infrequent. (*Id*.). Dr. Walters noted that Plaintiff's mood had improved and that she appeared "brighter." (*Id*.). She was alert and oriented, casually dressed, cooperative, her mood was "okay," her affect was congruent, her memory and intellectual functioning were intact, and she experienced no hallucinations or suicidal or homicidal ideation. (R. at 334). Dr. Walters also noted, however, that Plaintiff's inability to sleep well and

her panic attacks had interrupted her life, had disrupted her marriage significantly, and prevented her from continuing to work at this time. (R. at 334). Plaintiff was diagnosed with major depressive disorder and panic disorder and was assessed a GAF score of 50. (R. at 335).

In February of 2007, Plaintiff underwent a psychological evaluation with therapist Craig Highberger, L.S.W., at the Braddock Center for Behavior Medicine, Indiana, PA. (R. at 340 – 43). Plaintiff complained of difficulty sleeping, increased anxiety and depression, inability to make decisions, and a lack of energy and happiness. (R. at 340 – 43). Plaintiff further complained of difficulty concentrating and loss of short-term memory. (R. at 340 – 43). Mr. Highberger noted that Plaintiff reported fleeting suicidal ideation at the present time. (R. at 341). Plaintiff complained of panic attacks ten to fifteen times per day. (R. at 337 – 40).

Mr. Highberger found nothing unusual in Plaintiff's mannerisms, or speech rate and pattern. (R. at 340 – 43). She was cooperative, had good insight and judgment, and had intact cognitive abilities. (R. at 340 – 43). Plaintiff was diagnosed with major depression and panic disorder, and Mr. Highberger wanted to rule out the existence of bipolar disorder. (R. at 340- 43). Plaintiff was assessed a GAF score of 50. (R. at 340 – 43). Mr. Highberger treated Plaintiff from February 2007 – April 2007, when he "referred her to another provider because of the intensity of her symptoms and [his] not having the time to see her more frequently." (R. at 442).

On March 13, 2007, Plaintiff had a psychiatric evaluation by Louis K. Hauber, M.D., at the Braddock Center for Behavior Medicine. (R. at 337 – 39). Dr. Hauber noted Plaintiff's complaints of inability to concentrate, lack of energy, lack of motivation, feelings of anxiety and panic, and difficulty sleeping. (*Id*.). Dr. Hauber believed significant indicators of bipolar disorder were present. (R. at *Id*.). However, he found Plaintiff's thoughts to be organized and logical, and she did not exhibit suicidal or homicidal ideation. (*Id*.). Plaintiff's appearance was appropriate,

she was cooperative, and she exhibited a pleasant demeanor, normal speech, good insight and judgment, and adequate attention and concentration. (*Id.*). She also had a noted history of non-compliance with prescribed medications. (*Id.*). Plaintiff was diagnosed with recurrent severe major depression and panic attacks. (*Id.*). Her assessed GAF score was 50. (R. at 338).

On April 2, 2007, Plaintiff sought a second opinion from Sarah Gatumu, M.D., as she reported that she did not think she had bipolar disorder. Dr. Gatumu conducted a mental evaluation and noted that Plaintiff complained of recent anxiety/ anxiety attacks, depressed mood, difficulty sleeping at night, fatigue, hopelessness, inability to concentrate, and racing thoughts. (R. at 346). Plaintiff did not complain of hallucinations, or suicidal or homicidal ideation. (*Id.*). Plaintiff mentioned that she was in therapy with a counselor at the time. (*Id.*). Dr. Gatumu found Plaintiff to be alert, oriented, well groomed, and easy to engage. (*Id.*). Plaintiff made good eye contact, had an "okay" mood, and bright and reactive affect. (*Id.*). There was no psychomotor retardation, no suicidal or homicidal ideation, and Plaintiff's thought processes were goal-directed and linear. (*Id.*). Dr. Gatumu diagnosed Plaintiff with major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder ("PTSD"). (*Id.*). Plaintiff was assessed a GAF score of 50. (*Id.*).

On that same day, April 2, 2007, Plaintiff was evaluated for treatment by Marijana Stovic, Psy.D. of Indiana Psychology Associates. (R. at 405). Plaintiff informed Dr. Stovic that she had been receiving psychiatric and therapy services through the Center for Behavioral Health and that her psychiatrist was treating her as having a bipolar disorder but that her therapist was ruling out a bipolar disorder. Dr. Stovic noted that Plaintiff arrived promptly and was casually dressed for her appointment. (R. at 408). She actively initiated and participated in discussion, her speech was coherent, goal directed, and articulate, she maintained good eye contact, was alert and oriented,

and reported no delusions, hallucinations, or suicidal or homicidal ideation. (*Id.*). She often laughed when discussing upsetting events. (*Id.*). Dr. Stovic diagnosed Plaintiff with major depressive disorder, and wished to rule out PTSD. (*Id.*). Plaintiff's GAF score was 53. (*Id.*).

Dr. Stovic continued to see Plaintiff for therapy through October of 2007. (R. at 392 – 99, 404). Dr. Stovic typically reported that Plaintiff arrived on time, was appropriately dressed, and actively participated in treatment. (R. at 392 – 99, 404). Plaintiff and Dr. Stovic went over techniques for managing Plaintiff's panic. (R. at 392 – 99, 404). By August 15, 2007, Dr. Stovic concluded that Plaintiff's diagnoses were major depressive disorder, single episode, mild, and PTSD. (R. at 410).

In a treatment summary dated January 14, 2008, Dr. Stovic noted that Plaintiff usually arrived promptly for therapy sessions and was appropriately dressed, she actively initiated and participated in discussions, she was articulate, goal directed, and coherent, she was motivated and insightful, she was alert and oriented, and she reported no suicidal or homicidal ideation. (R. at 436 – 37). Plaintiff reported to Dr. Stovic that relaxation techniques taken from therapy allowed her to manage anxiety most of the time, and that a new exercise regimen was helping her cope with feelings of depression. (R. at 437).

On April 26, 2007, Plaintiff was admitted to a partial hospitalization program at the Community Guidance Center. (R. at 349). At the time of her admission, Plaintiff reported an increase in her depression, irritability and hopelessness. She also reported that she was not happy with her experience with Dr. Gatumu. (R. at 349). She complained that her current medications gave her headaches and made her feel suicidal and, "zoned out." (R. at 349). She also complained of sleep disturbance and anxiety. (R. at 349). Plaintiff was diagnosed with major depressive disorder and panic disorder with agoraphobia. (R. at 349). Her therapist wished to rule out the

existence of bipolar disorder. (R. at 349). Plaintiff was assessed a GAF score of 53. (R. at 349). A plan was then formulated for further treatment. (R. at 349 – 50).

In April and May of 2007, Plaintiff underwent magnetic resonance imaging ("MRI") of the brain and transcranial doppler (R. at 370, 372), as a result of Plaintiff's complaints of headaches, visual blurring, dizzy spells, and jaw numbness. Both studies returned normal results. (*Id*.).

On March 11, 2008, Mr. Highberger completed a Statement of Ability to do Work-related Activities on Plaintiff's behalf. (R. at 439 – 42). Mr. Highberger prefaced the assessment by stating that the purpose of his treatment of Plaintiff was to reduce her symptomology – not evaluate or increase her ability to engage in employment activities. (R. at 442). Mr. Highberger stated that at the time of his treatment of Plaintiff, he "did not think she was employable at the time, but [he] cannot specifically identify the areas to justify the subjective impression." (R. at 442). Mr. Highberger opined that Plaintiff was markedly limited in all areas of functioning and diagnosed her with severe, recurrent major depression, and potential bipolar disorder. He provided Plaintiff a GAF score of 50. (R. at 439 – 42).

### C. Residual Functional Capacity

A Mental Residual Functional Capacity ("RFC") Assessment was completed by state agency evaluator Richard A. Heil, Ph.D., on April 30, 2007. (R. at 351 – 53). After reviewing the medical file, he found that Plaintiff suffered from major depression, panic attacks, generalized anxiety disorder, and PTSD. (*Id*.). Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions. (*Id*.). In all other respects Plaintiff was moderately to not significantly limited. (*Id*.).

D.  Administrative Hearing

At the time of the hearing, Plaintiff was involved in two mental health treatment programs. (R. at 28).  She was also receiving prescription anti-depressants. (R. at 29 − 30).  Plaintiff testified that fatigue, dry mouth, insomnia, stomach pain, constipation, dizziness, and nausea were common side effects she experienced while on her medications. (R. at 29 − 30).  She also testified that occasionally the side effects could last for over an hour and required her to lie down. (R. at 30).  According to Plaintiff, the medications did not adequately control her mental health issues. (R. at 43).

Plaintiff testified that she was receiving disability benefits from her former employer for depression and anxiety. (R. at 31).  However, Plaintiff's insurance was eventually cut off, forcing her to find free treatment programs, and disrupting her ability to maintain consistent treatment. (R. at 31, 42 - 43).  Plaintiff explained that she was hospitalized for inpatient psychiatric care once in September of 2006. (R. at 30).

Plaintiff testified that her panic attacks and anxiety began at her last place of employment for reasons she could not explain. (R. at 32, 40 − 41).  Plaintiff stated that circumstances at work began to trigger sudden panic attacks and anxiety up to six or seven times in a single workday. (R. at 32 − 33).  Plaintiff testified that significant paperwork, office turmoil and stress, enclosed spaces, large numbers of people, and increases in workload all contributed to causing her panic attacks. (R. at 32 − 33).  Plaintiff's mental health began to impact her ability to perform her job. (R. at 33).  Plaintiff stopped working upon the recommendation of her doctor. (R. at 33).

The panic attacks were described by Plaintiff as crushing chest pain, sweating, shaking, stomach pain, racing thoughts, fear of death, and the inability to catch her breath. (R. at 35).  Her episodes would last from fifteen to twenty minutes. (R. at 35).  Plaintiff would experience anxiety

after her panic attacks. (R. at 36).  Her panic and anxiety improved following her leave from work. (R. at 33, 41).

Since August of 2007, when Plaintiff left work, she has been diagnosed and treated for depression, anxiety, PTSD, bipolar disorder, unipolar disorder, and agoraphobia. (R. at 33). Plaintiff testified that her depression often leaves her feeling lonely, sad, hopeless, unmotivated, fatigued, tearful, suicidal, and achy. (R. at 34).  According to Plaintiff, her depression is often exacerbated following a panic attack. (R. at 34).  She testified that she sleeps most of the day as a result. (R. at 35).  Plaintiff's depression typically persists for two to three weeks, followed by a week of manic behavior. (R. at 37 – 38).  During Plaintiff's manic phases, she suffers from insomnia, hyperactivity, and inappropriate outbursts. (R. at 37 – 38).

Plaintiff testified that a panic attack can render her non-functioning for a period of time. (R. at 41 – 42, 49).  From the time a panic attack starts, she can expect to be preoccupied for approximately two hours of the day. (R. at 50).  She engages in counting and breathing exercises, listens to relaxation tapes, and writes in her journal. (R. at 50).  She also often paces for a period of time after an attack. (R. at 50).

Plaintiff testified that she generally awakes each day at ten or eleven o'clock in the morning, takes her medication, makes breakfast, and checks her email. (R. at 49).  She then walks her sister's dog and paints ceramics to help calm her nerves. (R. at 49).  If household chores such as general cleaning, cleaning dishes, or laundry need to be completed, Plaintiff works around the house during the day. (R. at 49).  Plaintiff occasionally fixes dinner for her and her sister in the evenings. (R. at 51).

Outside of her home, Plaintiff is able to go out to restaurants with her sister and is capable of shopping several times a week with her father – though she claims that she tends to go shopping

late at night to avoid crowds. (R. at 38 – 39). Plaintiff also goes to the laundromat during down periods when there are not many other customers. (R. at 39).

Following Plaintiff's testimony, the ALJ asked the VE what jobs would be available to a hypothetical person of Plaintiff's age, education, and work background, and limited to light work requiring only occasional postural maneuvers such as stooping, crouching, crawling, kneeling, and climbing stairs, ramps, and ladders, no exposure to heat extremes, and involving only simple, routine, repetitive tasks, not performed in a fast paced production environment, requiring only simple work related decisions and relatively few work place changes and interactions with supervisors, coworkers, and the general public. (R. at 53).

The VE responded that the following jobs would be available to such a person: "shipping and receiving clerk," with 78,660 positions available in the national economy; "garment sorter," with 62,244 positions available; "embossing machine operator," with 61,560 positions available; and, "paper sorter," with 54,720 positions available. (R. at 53). These jobs would allow for five unexcused absences per year in excess of contracted medical leave and vacation time. (R. at 54). Plaintiff's attorney inquired of the VE whether any of the above mentioned jobs would still be available if the hypothetical person would remain off-task for ten to fifteen minutes every hour. (R. at 54). The VE replied that none of the listed jobs would be available. (R. at 55). Plaintiff's attorney then asked if the same jobs would still be available if the hypothetical person would be absent from work more than once or twice per month. (*Id*.). The VE again replied that none of the listed jobs would be available. (*Id*.).

# IV.  STANDARD OF REVIEW

The Act limits judicial review of disability claims to the Commissioner's final decision.  42 U.S.C. §§ 405(g); 42 U.S.C. § 1383(c)(3).  If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court.  42 U.S.C. § 405(g); *Schaudeck v. Comm'n of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999).  The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  It consists of more than a scintilla of evidence, but less than a preponderance.  *Stunkard v. Secretary of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation.  20 C.F.R. §§ 404.1520 and 416.920 (1995).  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520; *Burnett v. Commissioner of Social Security*, 220 F.3d 112,  118-19 (3d Cir. 2000) (*citing Plummer v. Apfel*, 186, F.3d 422, 428 (3d Cir. 1999)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there "exists a medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period."  *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987);  42 U.S.C. § 423 (d)(1)(1982).

This may be done in two ways:

>    (1)  by introducing medical evidence that the claimant is disabled *per se* because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1.  *See Heckler v. Campbell*, 461 U.S. 458 (1983);  *Stunkard*, 841 F.2d at 59;  *Kangas*, 823 F.2d at 777; or,

>    (2)  in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ."  *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes the claimant from returning to his or her former job.  *Stunkard*, 841 F.2d at 59;  *Kangas*, 823 F.2d at 777.  Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy.  *Stunkard*, 842 F.2d at 59;  *Kangas*, 823 F.2d at 777;  *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986);  *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

Where a claimant has multiple impairments which may not individually reach the level of severity necessary to qualify as an impairment delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1,  the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of one of these listed impairments.  *Bailey v. Sullivan*, 885 F.2d 52 (3d Cir. 1989) ("in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.")

In this case, the ALJ determined that Plaintiff was not disabled within the meaning of the Act at the fifth step of the analysis. The ALJ based this conclusion on her finding that with vocational adjustment to work there were a significant number of light duty jobs in the national economy that Plaintiff could perform.

## V.   DISCUSSION

In her decision, the ALJ concluded that Plaintiff suffered from the following severe medically determinable impairments: costochondritis, atypical chest pain, depressive disorder, anxiety disorder, and panic disorder. (R. at 11).  Despite these impairments, the ALJ determined that Plaintiff was capable of engaging in substantial gainful employment on a full-time basis because Plaintiff's impairments only limited her to light work requiring only occasional postural maneuvers such as stooping, crouching, crawling, kneeling, and climbing stairs, ramps, and ladders, no exposure to heat extremes, and involving only simple, routine, repetitive tasks, not performed in a fast paced production environment, requiring only simple work related decisions and relatively few work place changes and few interactions with supervisors, coworkers, and the general public. (R. at 13).  Based upon the testimony of the VE, the ALJ found that job opportunities existed for Plaintiff in significant numbers in the national economy. (R. at 20). Plaintiff was not, therefore, eligible for DIB. (R. at 20 – 21).

Plaintiff argues that the ALJ erred in failing to give proper weight to the medical opinions of Plaintiff's treating physicians, in failing to give proper weight to the medical opinion of Plaintiff's therapist, Mr. Highberger, and by improperly relying upon Plaintiff's activities of daily living to discredit her subjective complaints. (Document No. 13 at 18).

Plaintiff first asserts that the medical notes of Dr. Walters, Dr. Diaz, and Dr. Hauber all consistently point to limitations which would prevent Plaintiff from engaging in substantial gainful activity on a full-time basis. (Document no. 13 at 19). Plaintiff alleges that the ALJ failed to indicate what medical evidence of record contradicted the findings of these doctors and allowed for a determination that the doctors' opinions were entitled to little weight, and that the ALJ failed to properly consider GAF scores provided by the doctors in their notes. (*Id.* at 19 – 25).

With respect to treating physicians, the United States Court of Appeals for the Third Circuit has held that a treating physician's opinions may be entitled to great weight - considered conclusive unless directly contradicted by evidence in a claimant's medical record - particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.* Further, the determination of disabled status for purposes of receiving benefits - a decision reserved for the Commissioner, only - will not be affected by a medical source simply because it states that a claimant is "disabled," or "unable to work." 20 C.F.R. §§ 404.1527(e), 416.927(e).

Unfortunately, Plaintiff fails to identify which of the findings of the above mentioned doctors supported a conclusion that Plaintiff was not capable of engaging in substantial gainful employment on a full-time basis, and fails to acknowledge that none of the doctors made specific findings indicating Plaintiff's functional limitations which tended to support Plaintiff's subjective complaints of limitation. As illustrated by Defendant, and as discussed by the ALJ in her decision,

Plaintiff's treating physicians typically found her to be alert and oriented, without paranoia, delusions, hallucinations, obsessions, compulsions, or phobias, exhibiting appropriate insight and judgment, and without suicidal or homicidal ideation. (Document No. 14 at 11; R. at 175, 179, 198, 207, 209 – 10, 215, 221 – 23, 225 – 29, 232, 236 – 47, 265, 278, 333 – 34, 337 – 43, 346 – 47, 408, 436 – 37).  It was also often remarked that Plaintiff's memory was intact, she exhibited normal mood and affect, she was cooperative, her speech was normal and clear, her fund of knowledge was adequate, her thoughts were organized and goal directed, and she experienced no psychomotor retardation. (Document No. 14 at 11; R. at 175, 179, 198, 207, 209 – 10, 215, 221 – 23, 225 – 29, 232, 236 – 47, 265, 278, 333 – 34, 337 – 43, 346 – 47, 408, 436 – 37).  Plaintiff also consistently engaged in a number of daily activities and managed to travel to Florida to visit her mother. (Document No. 14 at 11; R. at 39, 49, 51, 392).  While it is acknowledged that Plaintiff's impairments produced functional limitations, Plaintiff has failed to adduce evidence illustrating that the ALJ did not adequately accommodate Plaintiff's limitations in her RFC assessment.

With respect to Plaintiff's claim regarding the treatment of her GAF scores, the United States Court of Appeals for the Third Circuit has held that a "GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings." *Gilroy v. Astrue,* 351 Fed. Appx. 714, 715 – 16 (3d Cir. 2009) (citing 66 Fed. Reg. 50764-5 (2000)). District courts wihtin this circuit have further recognized that while GAF scores can indicate an individual's capacity to work, they also correspond to unrelated factors, and absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score does not establish disability. *Coy v. Astrue*, 2009 WL 2043491 at *14 (W.D.Pa. 2009) (citing *Chanbunmy v. Astrue*, 560 F.Supp.2d 371, 383 (E.D.Pa. 2008)).  An ALJ's failure to include a GAF score in his or her discussion is considered to be harmless error where a claimant has not explained how the

GAF score would have itself satisfied the requirements for disability in light of potentially contradictory evidence on record. *Rios v. Astrue*, 2010 WL 3860458 at *8 (E.D.Pa. 2010) (citing *Purnell v. Astrue*, 662 F.Supp.2d 402, 415 (E.D.Pa. 2009)).

While Plaintiff was assessed lower GAF scores, on occasion, it must be noted that in the same period of time, Plaintiff also received higher GAF scores. Plaintiff once received a GAF score of 25, which the ALJ omitted from her discussion. However, the ALJ did discuss the hospitalization event which prompted the score, noting that upon discharge, Plaintiff received a score of 61. (R. at 14). Following that point in time, Plaintiff's GAF scores did not again take such a precipitous plunge. The ALJ clearly discussed this in her determination. (R. at 14 – 16). Plaintiff's scores generally ranged from 45 to 65. (R. at 14 – 16).

While GAF scores are certainly a relevant indictor of an individual's psychological health over time, the lack of consistently low GAF scores was not sufficient to sway the ALJ to conclude Plaintiff suffered greater functional limitation than was found. The ALJ also discussed the relevant medical opinions accompanying these scores, and found that they did not indicate symptomology severe enough to preclude Plaintiff from engaging in substantial gainful activity. Further, the doctors who assessed the GAF scores never indicated whether the scores corresponded to Plaintiff's social or functional capacity. *See Coy*, 2009 WL 2043491 at *14 (quoting *Chanbunmy*, 560 F.Supp.2d at 383 ("A GAF score, without evidence that it impaired the ability to work, does not establish an impairment.")). *See also Gilroy,* 351 Fed. Appx. at 716 (the ALJ was not found to have erred when omitting a GAF score where the doctor in question did not make specific limitations findings or otherwise explain the basis for the GAF score, and the ALJ discussed the doctor's reports). This is of particular note with respect to Mr. Highberger's GAF scores, as he admitted that he was never assessing Plaintiff according to her ability to work. (R. at

439 – 42).  None of Plaintiff's physicians included functional capacity findings with their GAF scores.  As such, Plaintiff has not persuaded this Court to find that the GAF scores indicated a greater degree of functional limitation than that found by the ALJ.  Therefore, the ALJ's consideration of Plaintiff's GAF scores was proper.

In terms of Mr. Highberger's assessment of Plaintiff's functional capacity, the ALJ provided sufficient evidence from the record to refute the accuracy of his findings.  Of greatest import was Mr. Highberger's opening statement about the basis for his conclusions and the lack of objective medical evidence to back up his assertions. (R. at 439 – 42).  When viewing this admission in conjunction with the lack of any narrative explanation for his check-box form findings, it is clear that the ALJ was justified in according the findings of Mr. Highberger little weight.

Finally, Plaintiff's activities of daily living were relevant evidence of Plaintiff's functional capacity and were certainly relevant in determining credibility. *See Russo v. Astrue*, 2011 WL 1289132 at * 4 – 5 (3d Cir. 2011); *Burns v. Barnhart*, 312 F.3d 113, 129 – 30 (3d Cir. 2002); *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999); 20 C.F.R. §§ 404.1529, 416.929.  The ALJ does not state anywhere in her decision that it is the Plaintiff's activities of daily living which, alone, prove Plaintiff is capable of working.  In conjunction with the medical evidence of record, the ALJ utilized Plaintiff's statements regarding her regular activities, and found that Plaintiff's limitations were not as great as she alleged. (R. at 13 – 19).  Indeed, the ALJ appeared to adequately provide for the worst of Plaintiff's stated limitations by including in her RFC assessment and hypothetical to the VE, that Plaintiff would be limited to simple tasks, and would not be required to interact with supervisors, co-workers, and the general public in any significant manner. (R. at 13).  Further, she was to work in a low pressure environment. (R. at 13).  As

Plaintiff's primary reasons for believing she was incapable of working were that she suffered panic attacks as a result of work stress and interactions with others, and that despite this, she managed interactions with her sister, father, treatment providers, and the ALJ at her hearing, it appears that the ALJ's determination adequately provided for Plaintiff's credibly established functional limitations. (R. at 32 – 33).

## VI.    CONCLUSION

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges which Plaintiff faces in seeking gainful employment.  However, under the applicable standards of review and the current state of the record, this Court must defer to the reasonable findings of the ALJ and her conclusion that Plaintiff is not disabled within the meaning of the Social Security Act, and that she is able to perform a wide range of light work.  The ALJ provided sufficient justification from the medical record and Plaintiff's personal testimony to allow this Court to conclude that substantial evidence supports her decision.

Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed.

An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

GIANINE BRACCIODIETA-NELSON,    )
                                                )
                   Plaintiff        )
                                                )
                     v.           )           02: 10-cv-854
                                                )
COMMISSIONER OF             )
SOCIAL SECURITY,          )
                                              )
                  Defendant     )

## ORDER OF COURT

      **AND NOW**, this 27th day of April, 2011, in accordance with the foregoing Memorandum

Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

     1.     Plaintiff's Motion for Summary Judgment (Document No. 12) is **DENIED**.

     2.     Defendant's Motion for Summary Judgment (Document No. 10) is **GRANTED**.

     3.     The Clerk will docket this case as closed.

                                                     BY THE COURT:

                                                     s/ Terrence F. McVerry
                                                     United States District Judge

cc:     Lindsay Fulton Brown, Esq.
          Email: lindsay@mydisabilityattorney.com

          Paul Kovac,
          Assistant U.S. Attorney
          Email: paul.kovac@usdoj.gov